# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

AMANDA H. KERSH,

          Claimant,

vs.

ANDREW M. SAUL,
Commissioner of Social Security,[1]
Defendant.

No.18-cv-2067-CJW

**REPORT AND RECOMMENDATION**

_____

      Claimant seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34 and for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381–85. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the following reasons, I recommend that the District Court **affirm** the Commissioner's decision.

## I.    BACKGROUND

      I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 13) and only summarize the pertinent facts here. This is an appeal from a denial of disability insurance benefits ("DIB") and supplemental social security income benefits ("SSI"). Claimant was born on February 12, 1985. (AR[2] at 243.) Claimant has at least a high

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] "AR" cites refer to pages in the Administrative Record.

1

school education and can communicate in English. (*Id* at 33, 211.) She allegedly became disabled due to being "near sighted to the point of being legally blind," post-traumatic stress disorder, adult attention deficit disorder, clinical depression, bipolar disorder, "carpal tunnel and limited ability in [her] left wrist and hand," weakness in her ankles due to bone damage, and nerve damage in her left hip and lower back. (*Id.* at 310.) Claimant's alleged onset of disability date was April 30, 2015. (*Id.* at 243.) Claimant filed an application for DIB on June 16, 2015. (*Id.*) Claimant filed an application for SSI on July 21, 2015. (*Id.* at 250.) Claimant's claim for DIB was originally denied on November 19, 2015. (*Id.* at 84-85.) Her claim for SSI was originally denied on January 4, 2016. (Id. at 164-67.) On reconsideration, benefits were again denied on March 17, 2016. (*Id.* at 122, 171-75.) A video hearing was held on November 9, 2017 with Claimant and her attorney Hugh Fields in Waterloo, Iowa and ALJ Mikel Lupisella in West Des Moines, Iowa. (*Id.* at 45-83.) Hearing reporter Anne Zenda and vocational expert ("VE") Kenneth Ogren were also present, but their locations were not noted on the record. Claimant and the VE testified. (*Id.* at 50–82.) The ALJ issued an unfavorable decision on February 12, 2018. (*Id.* at 15–35.)

Claimant requested review, which the Appeals Council denied on July 2, 2018. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481 (2019).

On September 4, 2018, Claimant timely filed her complaint in this Court. (Doc. 4.) The case was originally assigned to Chief Magistrate Judge C.J. Williams. When Judge Williams was appointed as United States District Court Judge, the case was reassigned to me. On December 18, 2018, the case was reassigned to the Honorable C.J. Williams and me. All briefs were filed by July 9, 2019. On that date, Judge Williams referred the case to me for a Report and Recommendation.

## II.     DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v.*

3

*Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is

responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

A. *The ALJ'S Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset date of April 30, 2015. (AR at 18.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: degenerative disc disease; left carpal tunnel syndrome; left distal radius fracture, status-post open reduction internal fixation; migraines/headaches; obesity; chronic hepatitis C; bipolar disorder; attention deficit/hyperactivity disorder ADHD; generalized anxiety disorder; major depressive disorder; and history of substance abuse. (*Id.*)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.*)

5

At step four, the ALJ found that Claimant had the RFC to perform light work with the following limitations:

> She cannot climb ladders, ropes, or scaffolds; cannot crawl; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, and crouch; can frequently push and/or pull with the left non-dominant upper extremity; can occasionally reach overhead with the left non-dominant upper extremity; can frequently reach in all other directions with the left non-dominant upper extremity; can frequently handle and finger with the left non-dominant upper extremity; can have only occasional exposure to extreme cold; can have only occasional exposure to irritants in the work setting, such as dust, odors, fumes, gases, and poor ventilation; can have no exposure to more than a "moderate" noise intensity level as described in the Selected Characteristics of Occupations; can have only occasional exposure to vibration, such as vibratory tools or machinery; can have no exposure to hazards, such as unprotected heights or dangerous, moving machinery; is limited to simple and routine tasks performed in a work environment free of fast-paced production requirements (i.e. no work on an assembly line), involving only simple, work-related decisions and routine work place changes; is limited to occasional transactional interaction with the public, i.e. sales, negotiation, customer service, or resolution of disputes; the work itself should largely deal with things rather than people throughout a typical workday; and there should be no tandem tasks or teamwork required.

(*Id.* at 19.) The ALJ further found Claimant was unable to perform any past relevant work. (*Id.* at 33.)

At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform, including bagger, stuffer, trimmer, bench hand, and inspector. (*Id.* at 34–35.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*)

6

*B.* ***The Substantial Evidence Standard***

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III.   DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) not fully and fairly developing the record related to Claimant's treating neurologist's notes, (B) not providing

good reasons for the weight afforded to the treating neurologist's opinions, and (C) not providing good reasons for finding Claimant was not credibly reporting her symptoms. (Doc. 17 at 2, 3–7.)  Claimant further argues the ALJ was not appointed in a constitutional manner, thus the ALJ's decision must be vacated and Claimant's claim remanded so a properly-appointed ALJ may adjudicate the claim.  (*Id.* at 2, 7–10.)

## A.  *The ALJ fully and fairly developed the record related to Claimant's alleged migraines and headaches.*

### 1.  *The Parties' Arguments*

Dr. Shah is Claimant's treating neurologist.  In February 2016, Claimant suffered a head injury.  (AR at 573.)  Claimant was the victim of an assault committed by her ex-husband, during which she was struck in the head with a wine bottle.  (*Id.* at 574.)  This assault was the reported onset of the chronic migraine events, and eventually, in November 2016, Claimant began seeing Dr. Shah for treatment.  (*Id.* at 614, 735.) Claimant argues the ALJ failed to fully and fairly develop the record by not obtaining Dr. Shah's treatment notes about Claimant's migraines and headaches from November 2016 to July 2017.  (Doc. 17 at 6.)  Claimant also asserts that because the ALJ did not obtain these alleged notes, the ALJ could not accurately assess Dr. Shah's credibility. (*Id.*)  Claimant points to case law "discussing the importance of full and fair record development in the context of migraines."  (*Id.* at 7 (citing *Snead v. Barnhart*, 360 F.3d 834, 838–39 (8th Cir. 2004); *Mann v. Colvin*, 100 F. Supp. 3d 710, 721–22 (N.D. Iowa 2015)).

Specifically, Claimant alleges that the ALJ knew Dr. Shah's medical records related to Claimant dated back to November 2016, and that the ALJ was aware that these records were missing because the earliest notes in the record are dated July 2017. (*Id.* at 5–7.)  Consequently, Claimant asserts that the ALJ could not have based his decision on substantial evidence.

In response, the Commissioner argues that the ALJ fulfilled his duty to develop the record. (Doc. 20 at 5.) First, the Commissioner notes that the Claimant never notified the Social Security Administration ("SSA") of any missing documents in the record, nor did she ask for assistance in retrieving the records. The Commissioner next points to the revised regulations regarding submission of evidence to the ALJ, which requires that parties "make every effort to ensure that the [ALJ] receives all of the evidence and must inform [the Commissioner] about or submit any written evidence, as required . . . no later than 5 business days before the date of the scheduled hearing." (*Id.* at 6 (citing 20 C.F.R. §§ 404.935(a), 416.1435(a)).) Given the fact that Claimant never notified or otherwise asked for assistance in retrieving the documents, the Commissioner argues that under the regulations, the ALJ may refuse to obtain or consider such evidence unless an exception applies, which Claimant has not argued. (*Id.*)

The Commissioner further asserts that Claimant had "an affirmative duty to promptly obtain and supply information to support [her] claim." (*Id.* at 7 (citing 20 C.F.R. §§ 404.1740(b), 416.1540(b)).) The Commissioner notes that Claimant did not undertake to find these alleged missing documents, or results from an MRI for which the ALJ held the record open for an additional two weeks, even though Claimant "was undoubtedly aware" that the results had not been sent by Dr. Shah, or by Claimant herself. (*Id.*)

Lastly, the Commissioner maintains that "a court may not remand an ALJ's decision for missing records unless the plaintiff can show unfairness or prejudice" and argues that the Claimant has not claimed any such unfairness or prejudice given the alleged missing documents. (*Id.* at 8 (citing *Samons v. Astrue*, 497 F.3d 813, 822 (8th Cir. 2007); *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993)).) Accordingly, the Commissioner states that the ALJ met his duty to fully and fairly develop the record.

Claimant filed a reply brief in response to the Commissioner's brief. (*See* Doc. 21.) In that response, Claimant asserts that the new five-day rule "is problematic for a number of reasons, including it makes no sense for an agency that often deals with unrepresented claimants with cognitive limitations to not just place an 'X number of days prior to hearing' requirement instead of a nebulous '5 business days requirement'" and that it is unclear how this new rule affects the ALJ's duty to develop the record. (*Id.* at 2.) Claimant further asserts that the ALJ "likely realized, or should have realized," that the record was incomplete regarding Dr. Shah's treatment notes and the ALJ should have compelled Dr. Shah to produce those documents after not responding to Claimant's counsel. (*Id.* at 2–3.) As such, Claimant again notes that the record must be fully and fairly developed before it can be used to determine whether Claimant is disabled. (*Id.* at 3.)

### 2.    *Analysis*

The "social security hearing is a non-adversarial hearing, and the ALJ has a duty to fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). The ALJ bears this responsibility "independent of the claimant's burden to press his case" and extends to cases where claimants are represented by counsel at the administrative hearing. *Stormo*, 377 F.3d at 806. Though it is the responsibility of the ALJ to develop the record, "[i]n general, [the claimant is] responsible for providing the evidence [the ALJ] will use to make a finding about [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(a)(3). When deciding if a case should be remanded because certain medical records were not obtained, the proper "inquiry is whether [Claimant] was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, [the Court] will not remand." *Onstad*, 999 F.2d at 1234 (citation omitted).

I find that Claimant was not subject to unfairness, nor was she prejudiced by the failure to obtain allegedly missing records from Dr. Shah. During the November 2017 hearing, the ALJ asked Claimant's counsel, "Mr. Field, have you had an opportunity to review the record?" (AR at 47.) To which Mr. Field answered, "I have, judge. And I have no objections to it." (*Id.*) Further, upon learning that Claimant was waiting on MRI results from Dr. Shah and bloodwork from other physicians, the ALJ left the record open for an additional 14 days with the potential for more time if needed. (*Id.* at 47–48.) Mr. Field had ample time to object to the record as compiled prior to the hearing, to request assistance in obtaining the treatment notes from Dr. Shah, and to supplement the record with the MRI results as well as the other alleged documents but failed to do so. Claimant was given an additional opportunity to object to the record as compiled, but again her lawyer indicated he had no objection. (*Id.* at 49.)

As the court noted in *Onstad*, "[w]hile the ALJ has a duty to develop the record fully and fairly, even when a claimant has a lawyer, it is of some relevance to us that the lawyer did not obtain . . . the items that are now being complained about." 999 F.2d at 1234. The same is true in this case. Despite Claimant's request to Dr. Shah, the record does not reflect that Claimant's representative followed up on that request, nor did he ask the ALJ for assistance in obtaining the records prior to, or during, the hearing. At the point that Mr. Field indicated that the record was sufficient aside from the pending MRI results and bloodwork. When he did not submit any such records in the following 14 days, the ALJ was absolved of any obligation to obtain more medical records. Notably, there was no mention of any eight-month gap in treatment notes during the hearing or on appeal to the Appeals Council. Even now, Claimant's argument regarding what treatment notes are allegedly missing is unclear. (Doc. 17 at 5 ("The record appears to be missing a number of Dr. Shah records.").)

The Commissioner is correct that 20 C.F.R. section 404.935 requires parties to "make every effort to ensure that the administrative law judge receives all of the evidence and must inform [the ALJ] about or submit any written evidence . . . no later than 5 business days before the date of the scheduled hearing." 20 C.F.R. § 404.935. Claimant had additional time to submit relevant evidence, or to inform the ALJ that such evidence existed, and she did not attempt to do so. As such, the C.F.R. enabled the ALJ to "decline to consider or obtain the evidence." (*Id.*) Claimant does not contend that any exception applies to this situation, and thus, the ALJ was not required to consider or obtain any alleged records from Dr. Shah or any other source.[3]

Claimant relies on *Snead v. Barnhart*, 360 F.3d 834 (8th Cir. 2004) and *Mann v. Colvin*, 100 F. Supp. 3d 710 (N.D. Iowa 2015) in support of the proposition that "[i]n order to fully and fairly develop the record, the ALJ had to obtain the records from the treating neurologist for a claimant that was claiming significant limitations due to her migraines and headaches." (Doc. 16 at 6–7.) Claimant's reliance on these cases is misplaced. In *Snead*, the claimant "suffered from congestive heart failure due to dilated cardiomyopathy." 360 F.3d at 838. In assessing the claimant's RFC, the ALJ dismissed two incidents of heart failure because they did not last for twelve months. *Id.* In doing so, the ALJ "gave no consideration to what effect [the] underlying heart condition might

---

[3] Claimant's additional arguments about the efficacy of the "five-day rule" are immaterial, as the ALJ granted additional time to develop the record after the conclusion of the hearing, which Claimant did not utilize. Additionally, Claimant here was represented by counsel, which undermines Claimant's argument that the rules are unfair to pro se claimants. In addition, if anything, "five business days" can give a claimant more actual calendar days to provide evidence than "five days before a hearing," so any claim of prejudice based on that language is unavailing. The exceptions to the rule provide coverage for circumstances in which a claimant did not comply because of "physical, mental, educational, or linguistic limitation(s) that prevented [the claimant] from informing [the ALJ] about or submitting the evidence earlier." 20 C.F.R. §§ 404.935(b)(2), 416.1435(b)(2). Claimant does not assert that any exception applies in this case.

have on [claimant's] ability to work." *Id.* at 839.  Further, the record in *Snead* contained "no clinical findings . . . that would undermine [the treating physician's] report that [claimant] could do no work."  *Id.*  The court found that the treating physician's opinion alone stood "as valid evidence that [claimant] may [have been] totally disabled and unable to work because of a heart condition."  *Id.*  Finding that this lack of consideration prejudiced the claimant's pursuit of benefits, the court ultimately reversed and remanded for further record development in light of these facts.  *Id.*

The circumstances surrounding the *Snead* decision are not analogous to the circumstances in the instant case.  Here, the ALJ did assign weight to Dr. Shah's opinions regarding Claimant's migraines in determining the RFC.  (AR at 28.)  The ALJ assigned "partial weight" to Dr. Shah's assessment of environmental limitations on Claimant's ability to work and ultimately included these limitations in the RFC.  (*Id.* at 19, 28 ("[C]laimant . . . can have only occasional exposure to irritants in the work setting, such as dust, odors, fumes, gases, and poor ventilation; can have no exposure to more than a "moderate" noise intensity level . . . .").)  Additionally, the ALJ assigned "little weight to opinions regarding the claimant being off task, missing multiple days of work per month, and requiring significant breaks throughout the day while working."  (*Id.* at 28.)  Regardless of the weight actually assigned, the ALJ considered and weighed Dr. Shah's opinion and other clinical findings and considered what effect they would have on Claimant's ability to work.  *See Snead*, 360 F.3d at 839.  More importantly, the case at bar can be distinguished from *Snead* because in this case, there are clinical findings that undermined Dr. Shah's opinion—Dr. Gonzalez documented that Claimant's headaches improved with medication.  (AR at 719, 721.)  These facts place the instant case outside of the scope of *Snead*.

In *Mann*, the claimant suffered from migraines, which was her primary impairment.  100 F. Supp. 3d at 718.  In finding that the record was not fully developed,

the court relied on the fact that "the record contain[ed] no opinion evidence from any treating or examining source as to [claimant's] RFC." *Id.* at 722. The court held that "[e]ven without an opinion from a treating or examining source, the ALJ's decision may be affirmed if there is other medical evidence demonstrating the claimant's ability to function in the workplace." *Id.* (citing *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000)). Considering the lack of treating opinions and *Nevland*, the court found that the ALJ did not sufficiently develop the record with "other medical evidence to support the ALJ's findings as to [claimant's] ability to function in the workplace." *Id.* The facts in *Mann* are distinguishable from those in the instant case. The record in the instant case contained an opinion from Dr. Shah, opinions from two state agency consulting physicians, as well as numerous other sources of medical evidence. (*See, e.g.*, AR at 112-16, 133-37, 632, 661, 699, 713, 715, 719, 721, 735.) This places the instant case outside of the scope of *Mann*. Therefore, I find that there was no allegation or showing of unfairness or prejudice, and that the ALJ fulfilled his duty to fully and fairly develop the record on this issue.

**B.      *The ALJ properly supported his decision to give the opinion of Claimant's treating neurologist partial to little weight.***

Dr. Shah is Claimant's treating neurologist and reportedly treated Claimant's headaches every three months beginning in November 2016. (*Id.* at 735.) The record contains only two records from Dr. Shah: treatment notes from July 2017 and an opinion from November 2017. (*Id.* at 709, 735.) The opinion titled "Headaches Medical Source Statement" describes Claimant's condition as "Chronic Migraine" and "Post Concussion Syndrome." (*Id.* at 735.) The opinion consists of several checkbox options to describe symptoms, limitations, triggers, and aggravating factors. (*Id.*) The opinion also consists of several fill-in-the-blank questions. (*Id.*) Dr. Shah fully completed the opinion form. (*Id.*) She described Claimant's headaches as "moderate," noted a frequency of 5-6

migraines per week, or more than 20 per month. (*Id.*) The opinion concluded with statements about Claimant's capacity for work and potential limiting factors. (*Id.* at 737-38.) Dr. Shah described Claimant's prognosis as "Guarded" and went on to state that Claimant would need breaks of at least 1-2 hours for every 3-4 hours of work, that she should be expected to spend at least 25% of her time off-task, and that she should be expected to be absent from work more than four days per month. (*Id.* at 737.)

ALJ Lupisella considered Dr. Shah's opinion and ultimately afforded it partial to little weight. (*Id.* at 28.) The ALJ afforded little weight to Dr. Shah's opinions regarding "the claimant being off task, missing multiple days of work per month, and requiring significant breaks throughout the day." (*Id.*) The ALJ assigned "partial weight to the environmental limitations suggested by [Dr. Shah]" and incorporated the limitations into the RFC. (*Id.*)

### 1. *Legal Standard for Evaluating Dr. Shah's Opinion*

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). "A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record as a whole.[4] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial

---

[4] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claims were filed on June 16, 2015 and July 21, 2015. Thus, the old regulations apply. *See id.*

weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and brackets omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted).

Claimant argues that the ALJ failed to provide good reasons for giving Dr. Shah's 2017 opinion "partial to little weight." (Doc. 13 at 6-8.) When a treating physician's medical opinion is not given controlling weight, the following factors will be examined to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

### 2. Analysis

#### a. Length and Frequency of Treatment Relationship

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). As described above, the record contains several references to Dr. Shah treating Claimant's migraines. (AR at 710, 713, 735–38.) Dr. Shah states that she has seen Claimant every three months since 2016. (*Id.* at 735.)[5] Therefore, this factor weighs in favor of giving the 2017 opinion more than partial to little weight.

---

[5] Although, as discussed *supra* in Part III.A, there is no documentation in the record for eight months of alleged treatment, there is no dispute that Dr. Shah began treating Claimant in 2016 and still treats her for migraine symptoms.

### b. Nature and Extent of Treatment Relationship

"Generally, the more knowledge a treating source has about [a claimant's] impairment(s), the more weight [the ALJ] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(ii). Dr. Shah is Claimant's treating neurologist and treats Claimant for chronic migraine and post concussion syndrome. (AR at 735.) Therefore, this factor weighs in favor of giving the 2017 opinion more than partial to little weight.

### c. Supportability

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937. In addition, "'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted)); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh*, 786 F.3d at 1132 (quotation omitted).

In her opinion, Dr. Shah provided several conclusory statements in the questionnaire titled "Headaches Medical Source Statement." (AR at 735.) In particular, one portion of the opinion asked Dr. Shah to answer questions about Claimant's work-related limitations. (*Id.* at 737.) Dr. Shah did not provide explanations, although she indicated that Claimant's headaches can be expected to continue for over one year, Claimant would be precluded from performing basic tasks while experiencing a headache, that Claimant would need unscheduled breaks to lie down lasting 1–2 hours for every 3–4 hours of work, and that Claimant should be expected to be off-task for over 25% of working hours. (*Id.*) In another section of the questionnaire, Dr. Shah checked certain headache triggers, aggravating factors, and sources of relief without explanation. (*Id.* at 736.) Dr. Shah's checkmarks without explanations "possess little evidentiary value." *Thomas*, 881 F.3d at 675.

I find that the ALJ properly supported his decision to assign Dr. Shah's opinions partial to little weight. In assigning the requisite weights, the ALJ noted that Dr. Shah's July 2017 treatment notes were inconsistent with her "rather marked functional opinion" just four months later. (AR at 28.) Specifically, the ALJ found it significant that in July 2017, Dr. Shah reported Claimant was "[d]oing well" and experienced 1–2 migraines and 14 days of minor headaches per month, while in November 2017, Dr. Shah opined that Claimant "experienced 5–6 headaches per week and greater than 20 per month" lasting from "4–6 hours" at a time. (*Id.*) Twenty several-hour long migraines in November 2017 is inconsistent with a report of 1–2 migraines and 14 minor headaches per month in July 2017. Further, the ALJ noted that Dr. Shah's July 2017 treatment notes on Claimant's neurological and physical exams support the finding that Claimant was "[d]oing well," but are inconsistent with the November 2017 opinion. (*Id.* at 28. *Compare id.* at 710–12, *with id.* at 735–38.) The 2017 notes are the final notes in the record from Dr. Shah. There is no allegation that there are any notes missing after July

2017. Moreover, even if the allegedly missing May 2016 to January 2017 notes indicated that Claimant was experiencing frequent migraines at the time, it is obvious that her treatment regimen was helping because by July 2017, Claimant's migraines were controlled, and her headaches were only mild. (*See id.* at 709.) An impairment that is controlled with treatment or medication is not disabling. *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) (citation omitted).

Claimant argues that the ALJ did not provide good reasons for assigning Dr. Shah's opinions partial to little weight. (Doc. 17 at 5.) Claimant supports this assertion by stating that "the July 2017 note is generally consistent with Dr. Shah's frequency reported in the November 2017 note—15 to 16 migraines and headaches per month in July 2017 is not inconsistent with 20 migraines and headaches per month in November 2017." (*Id.*) The ALJ did not rely on the number of headaches alone, but rather, as will be discussed in more detail in the consistency analysis, the record taken as a whole. Moreover, Dr. Shah recognized a difference between migraines and regular headaches in July, noting that Claimant was only experiencing 1-2 migraines and 14 minor headaches per month, rather than the "15-16 migraines and headaches" Claimant described or the "more than 20 migraines" Dr. Shah described in November 2017. A reasonable mind could "accept [these inconsistencies] as adequate to support [the ALJ's] conclusion." *Biestek*, 139 S. Ct. at 1154 (internal citations and quotations omitted.)[6]

Based on the noted inconsistencies between Dr. Shah's treatment notes and her opinion, a reasonable mind could accept the support as adequate, and therefore, this factor weighs against giving the 2017 opinion more than partial to little weight.

---

[6] Claimant also supports her argument by asserting that the ALJ failed to fully develop the record, given the alleged eight-month gap in treatment notes. (Doc. 17 at 5–6.) The merits of this argument are discussed in Part III.A *supra*, but even without the alleged missing notes, I find that this factor weighs against assigning Dr. Shah's opinion more than partial to little weight.

### d. Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). As discussed above, the ALJ concluded Dr. Shah's November 2017 opinion was "[i]nconsistent with [her] rather marked functional opinions" listed in treatment notes from July 2017, only four months prior to the treatment opinion. (AR at 28.) The ALJ points out that the July 2017 treatment note indicated "claimant was doing well on medications" and reported "only 1–2 migraines on a monthly basis, along with . . . 14 minor headaches per month." (*Id.* at 28; *see also id.* at 710.) Dr. Shah's opinion referred to Claimant's condition as "chronic migraines," and Dr. Shah noted that Claimant suffered from 5–6 headaches per week, and more than 20 per month, with the typical length totaling from 4-6 hours. (*Id.* at 735.) This is inconsistent with the record as a whole.

The record shows that Claimant began seeing Dr. Gonzalez, her primary care provider, on March 31, 2016 following her February 2016 head injury. (*Id.* at 721.) The record contains treatment notes from a number of Claimant's visits with Dr. Gonzalez. (*Id.* at 681–722.) During both a March 2016 and a May 2016 visit, Claimant updated Dr. Gonzalez about her migraines, noting that her headaches were improving in severity and length. (*Id.* at 719, 721.) Significantly, Dr. Gonzalez's notes reflect little to no discussion of headache symptoms from May 2016 to January 2017. (*Id.* at 683, 687.) In an appointment on August 2, 2016, Dr. Gonzalez did not indicate any discussion of migraines or headaches. (*Id.* at 717.) This time period encompasses the eight-month treatment gap in which there are no records of Claimant's visits with Dr. Shah. Although there are treatment notes in the record dated after July 2017, those notes do not support Dr. Shah's opinion. (*Id.* at 701-08.) The ALJ noted that Dr. Gonzalez "continually reported the claimant as healthy appearing and in no acute distress throughout all

evaluations during this period."[7]  (*Id.* at 28 (citing AR at 681, 685, 687, 713, 717, 719, and 721.))  The ALJ found Dr. Shah's opinion regarding the frequency of Claimant's symptoms to be inconsistent with Dr. Gonzalez's notes about Claimant's visits and apparent distress level.  (*Id.* at 28.)  Regardless of the treatment gap, I agree that Dr. Gonzalez's notes reflect consistent improvement in the severity and length of Claimant's headache symptoms over that period.  (*Id.* at 713, 715, 719, 721.)  I find that Dr. Shah's opinion is inconsistent with Dr. Gonzalez's treatment notes from the relevant time period.

The improvement trend is evident in other medical treatment notes.  First, in April 2016, during a meeting with social worker Patricia Nelson, Ms. Nelson noted that Claimant "[h]ad a follow up for headaches on the 31st and says that the headaches are better in that they come and go and aren't constantly there [and that she] [i]s taking Topamax for them."  (*Id.* at 632.)  In December 2016, during the alleged records gap, Claimant visited Dr. Vicki Boling for a "med management" appointment.  (*Id.* at 661.)  During that appointment, Dr. Boling noted that Claimant's headaches were "getting less frequent" and recommended no medication changes.  (*Id.*)  Additionally, the same

---

[7] Claimant argues, "[c]oncerning objective findings, a finding of 'no acute distress', the ALJ is playing doctor by attaching special meaning to such examination findings."  (Doc. 17 at 5 (citing *Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017)).)  In so asserting, Claimant declined to offer any examples from the record in which the ALJ was "playing doctor" by using the phrase "no acute distress."  (*See id.*)  This is an underdeveloped argument that the Court need not address.  *See Aulston v. Astrue*, 277 F. App'x 663, 664-65, 2008 WL 2066019 (8th Cir. 2008) (declining to address underdeveloped argument) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases for proposition that undeveloped arguments are waived); *Rotskoff v. Cooley*, 438 F.3d 852, 854–55 (8th Cir. 2006) (considering undeveloped argument "abandoned for failure to provide any reasons or arguments for his contentions") (quotation omitted).  The record contains numerous notes from doctors stating that Claimant appeared to be in "no acute distress" during the relevant time period.  (*E.g.*, AR at 614, 616, 683, 687, 715, 717, 721.)  To the extent the ALJ relied on those notes to evaluate Claimant's claims of disabling migraine pain, the ALJ was not only allowed, but also required, to do so.

improvement trend was noted during a June 2017 Disability Exam with Dr. Paul Conditt. (*Id.* at 699.)  Dr Conditt's notes from the Exam state, "[Claimant] developed significant migraines [after the February 2016 assault], but recently they've subsided a good bit because Dr. Shah (neurologist) has worked with her."  (*Id.*)  I find that Dr. Shah's opinion is also inconsistent with other treatment notes from the relevant time period.

The inconsistencies shown in the 2017 opinion; Dr. Shah's treatment notes from July 2017 regarding the relevant time period; treatment notes from Dr. Gonzalez, Ms. Nelson, and Dr. Boling; and Dr. Conditt's opinion support the ALJ's findings.  This factor does not weigh in favor of assigning the 2017 opinion more than partial to little weight.

### e.    Specialization

"[G]enerally [the ALJ will give] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(c)(5).  Dr. Shah is a physician who specializes in neurology and gave an opinion in her area of expertise about a patient under her care.  (AR at 735–38.)  Therefore, this factor is weighs in favor of giving the 2017 opinion more than partial to little weight.

### f.    Conclusion

After a thorough review of the entire record, I find that the ALJ's opinion regarding the 2017 opinion is supported by substantial evidence on the record as a whole and should not be disturbed.  I recommend that the ALJ's decision on this issue be affirmed.[8]

---

[8] The subhead associated with this section of Claimant's brief was "The ALJ did not provide good reasons for the weight afforded to the treating neurologist opinions of Dr. Shah and Ms. Kersh's subjective reports of limitations."  (Doc. 17 at 3.)  The majority of the section is devoted to arguments about how the ALJ weighed Dr. Shah's opinion.  However, Claimant also makes the following statements.

### C. Claimant failed to timely raise her Appointments Clause argument under *Lucia v. SEC*.

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that SSA ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. (Doc. 17 at 7-11.)

---

The Eighth Circuit caselaw defers to the ALJ's credibility determination "provided the determination is supported by 'good reasons and substantial evidence.'" *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014). The general factors for evaluating credibility were set out years ago in *Polaski v. Heckler* and are still applicable. *See Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017).

.    .    .

Ms. Kersh had numerous traumas occur during her lifetime. She has been beaten by former partners in relationship [sic] and lost a very young child due to the actions of one her exes. (*See* TR 494, 564-65, 642, 649). Besides the wine bottle attack in February of 2016, the record contains several other attacks, including an attack in June 28, 2012, with pictures of the results. (*See* TR 70-72, 401-24). In addition to her migraines and headaches, she dealt with anxiety, PTSD and depression. (*See* TR 614-16). Many of Ms. Kersh's physical complaints relate in some manner to prior beatings from one of her exes. (*See* TR 618). She eventually got away from her exes, and then did better for periods of time while isolating herself as recognized by the consultative examiner, Dr. Paul Conditt, Psy.D. (*See* TR 566). However, if around people for periods of time, she would have anxiety attacks. (TR 58-59). She reported that stress increased her migraine and headache symptoms to providers. (*See* TR 614). Ms. Kersh generally tried to limit her activities to avoid migraine and anxiety triggers. (TR 60). The ALJ did not provide good reasons supported by substantial evidence on the record as a whole for finding Ms. Kersh's claimed limitations not credible.

(*Id.* at 4, 6.)
To the extent these two paragraphs are an argument that the ALJ did not conduct a proper *Polaski* analysis, the argument is underdeveloped, and therefore waived. *See Aulston*, 277 F. App'x at 664-65. Claimant does not cite the parts of the ALJ's opinion with which she takes issue and cites no *Polaski* factors that the ALJ failed to acknowledge and examine. *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (ALJ need not methodically address each *Polaski* factor as long as ALJ acknowledges and examines each factor).

Claimant asserts this Court should vacate the denial of benefits by ALJ Lupisella and remand the case for decision by what she contends is a properly-appointed ALJ. (*Id.* at 7.) Claimant admits she is asserting this Appointments Clause challenge for the first time in her brief to this Court. (*Id.* at 8-10.)

Claimant's case presents a procedural difference from most of the other cases that I have previously addressed on this issue. In this case, the Appeals Council denied review of the ALJ's decision after *Lucia* was decided on June 21, 2018. The Appeals Council denied Claimant review on July 2, 2018. (AR at 1-5.) However, that procedural difference did not change the arguments proffered by Claimant and does not change my recommendation. It does, however, change part of the final reasoning for my recommendation.

Claimant asserts that her case can be distinguished from many of the earliest cases addressing this issue because the earlier cases were decided before EM-18003 was issued by the SSA and before former Acting Commissioner Berryhill's authority lapsed, which "led the SSA to lack a Department Head that could provide a remedy for an Appointments Clause challenge." (Doc. 17 at 7.) For support, Claimant cites SSR 19-1p, 2019 WL 1202036, Effect of the Decision in *Lucia v. Securities and Exchange Commission (SEC)* on Cases Pending at the Appeals Council. (*Id.* at 7-8.) However, SSR 19-1p is inapplicable to Claimant's case because the ruling only applies to challenges timely raised before the Appeals Council or previously raised at the ALJ level. 2019 WL 1202036, at *9583; *see also Murphy v. Comm'r of Soc. Sec.*, No. 18-CV-61-LRR, 2019 WL 2372896, at *7 (N.D. Iowa April 10, 2019) (addressing SSR 19-1p and holding that claimant waived *Lucia* issue when she raised it for the first time in the district court), *appeal docketed*, No. 19-2202 (8th Cir. June 12, 2019).

Claimant also cites *Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019), *affirmed*, *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, -- F.3d --, 2020 WL

370832 (3d Cir. Jan. 23, 2020); *Probst v. Berryhill*, No. 5:18-cv-130-JG, 2019 WL 1749135 (E.D.N.C. March 22, 2019), *appeal docketed*, *sub nom Probst v. Saul*, No. 19-1529 (4th Cir. May 17, 2019); and other cases from those districts and encourages the Court to adopt *Bizarre's* reasoning in this case. (Doc. 17 at 10; Doc. 21 at 3.) The *Bizarre* court held that it did "not believe that [the claimant] was required to raise her [Appointments Clause challenge] before the ALJ or Appeals Council in the first instance or that failure to do so worked a forfeiture of that claim." 364 F. Supp. 3d at 425. I respectfully disagree and decline to adopt the *Bizarre* court's holding. Instead, I agree with the holding in *Murphy*: "[T]he court respectfully disagrees with the *Bizarre* court's holding. This court believes that failure to raise an Appointments Clause challenge before the ALJ or Appeals Council at the agency level waives the issue on judicial review at the district court level." 2019 WL 2372896, at *7 (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013); *Anderson v. Barnhart*, 344 F.3d 809, 814) (8th Cir. 2003)).

Furthermore, the recent decision in *Griffin v. Comm'r of Soc. Sec.* addressed the Third Circuit's decision in *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, -- F.3d --, 2020 WL 370832 (3d Cir. Jan. 23, 2020), and provided additional reasons why *Murphy* is still the better view. No. 18-CV-85-LRR, 2020 WL 733886 (N.D. Iowa Feb. 13, 2020).

> [I]n *Ramazetti v. Comm'r of Soc. Sec.*, No. 8:19-cv-260-T-MAP, 2020 WL 428950 (M.D. Fla. Jan. 28, 2020), the district court determined that the claimant's Appointments Clause challenge failed because the claimant waived the issue by not raising it before the ALJ or Appeals Council. *See id.* at *8. Further, the district court stated that "[t]he Supreme Court in *Lucia* did not make a blanket finding that all ALJs are subject to the Appointments Clause, just that SEC ALJs are so subject." *Id.* The district court points out that, "[a]t the time the Supreme Court decided *Lucia*, the SEC had only five ALJs. . . . In contrast, there are currently over 1,700 Social Security Administration ALJs." *Id.* The district court also notes that

"[t]he Social Security Administration annually receives about 2.6 million initial disability claims and completes about 689,500 ALJ hearings; in 2018, it took an average 809 days to process a claim from its initial receipt to an ALJ decision, with more than 850,000 people waiting for ALJ hearings." *Id.* The district court concluded that "[i]f courts were to apply *Lucia* to Social Security cases as Plaintiff argues this [c]ourt should, millions of cases would need [to] be remanded for rehearing by a different ALJ. Given these important efficiency concerns and the Supreme Court's specific findings in *Lucia*, the [c]ourt is skeptical that *Lucia* is even controlling as to Social Security Administration ALJs." *Id.* (quoting *Miaolino v. Comm'r of Soc. Sec.*, No. 2:18-cv-494-FtM-UAM, 2019 WL 2724020 (M.D. Fla. July 1, 2019)).

*Id.* at *10 (all alterations except first set of brackets in original).

This Court has ruled in favor of the Commissioner on similar claims on several occasions. *See Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16 (N.D. Iowa Oct. 10, 2019); *Gilbert v. Saul*, No. C18-2045-LTS, 2019 WL 4751552, at *20 (N.D. Iowa Sept. 30, 2019); *Squier v. Saul*, No. 18-CV-3026-LTS, 2019 WL 4696415, at *10 (N.D. Iowa Sept. 26, 2019); *Rollie v. Saul*, No. 18-CV-129-CJW-KEM, 2019 WL 4673220, at *10 (N.D. Iowa Sept. 25, 2019); *Dewbre v. Comm'r of Soc. Sec.*, No. 18-CV-4055-LRR, 2019 WL 4344288, at *6 (N.D. Iowa Sept. 12, 2019); *Sexton v. Saul*, No. C18-1024-LTS, 2019 WL 3845379, at *8 (N.D. Iowa Aug. 15, 2019); *Frazer v. Saul*, No. C18-2015-LTS, 2019 WL 3776996, at *4 (N.D. Iowa Aug. 12, 2019); *Murphy*, 2019 WL 2372896, at *7; *White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS, 2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

In *Stearns*, this Court ruled as follows:

> The United States District Court for the Central District of California has considered *Lucia* in the Social Security context, holding that claimants have forfeited the Appointments Clause issue by failing to raise it during administrative proceedings. *See Trejo v. Berryhill*, Case. No. EDCV 17-0879-JPR, 2018 WL 3602380, at *3 n.3 (C.D. Cal. July 25, 2018). I find this holding to be consistent with [relevant precedent]. Stearns' argument that an issue need not be raised if the ALJ does not have authority to decide it does not hold water under *Lucia*. *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely challenge" is entitled to relief. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182-83).
>
> In *Lucia*, the Supreme Court acknowledged the challenge was timely because it was made before the Commission. *Id*. In the context of Social Security disability proceedings, that means the claimant must raise the issue before the ALJ's decision becomes final. . . . *Lucia* makes it clear that this particular issue must be raised at the administrative level.
>
> Because Stearns did not raise an Appointments Clause issue before or during the ALJ's hearing, or at any time before the ALJ's decision became final, I find that she has forfeited the issue for consideration on judicial review. As such, her request for remand on this basis is denied.

2018 WL 4380984, at **5–6 (paragraph break added).

Finally, although Claimant argues that raising the issue during the administrative process would have been futile because Social Security EM-18003 prevented the ALJ from addressing the issue (Doc. 17 at 10), nothing stopped Claimant from raising the issue during the administrative process and preserving it for appeal or attempting to raise it in an amended appeal since *Lucia* was decided prior to the Appeals Council's decision in her case. In addition, Claimant's argument that former Acting Commissioner Berryhill's authority lapsed between November 2017 and April 2018, leaving the SSA with no one with the power to appoint an inferior officer to hear her claim or otherwise decide her claim much of the time it was pending (*Id*. at 9-10), is unavailing for the same

27

reason. Nothing prevented Claimant from raising this issue in her appeal or attempting to raise it in an amended appeal once *Lucia* was announced.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the decision of the ALJ and **dismiss Plaintiff's case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 25th day of February, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

28